1  TERRY R. MILLER (Colo. Bar No. 39007)
2  admitted *pro hac vice*
   Email: millert@sec.gov
3  Attorney for Plaintiff
   Securities and Exchange Commission
4  1961 Stout Street, Suite 1700
5  Denver, Colorado 80294
   Telephone: (303) 844-1000
6  Facsimile: (303) 297-3529

7

8  ## UNITED STATES DISTRICT COURT

9  ## DISTRICT OF NEVADA

10

11 SECURITIES AND EXCHANGE           Case No. 20-cv-2303
12 COMMISSION,
                 Plaintiff,           **COMPLAINT**
13
         vs.
14                                    **JURY TRIAL DEMANDED**
   CAPSOURCE, INC.,
15 STEPHEN J. BYRNE, and
   GREGORY P. HERLEAN
16               Defendants.
17

18

19      Plaintiff, the United States Securities and Exchange Commission ("SEC"),
20 alleges as follows:
21
                        **JURISDICTION AND VENUE**
22
23      1.      The Court has jurisdiction over this action pursuant to Sections 20(b),
24 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)],
25 and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act [15 U.S.C.
   §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a)].
26
27      2.      Defendants have, directly or indirectly, made use of the means or
   instrumentalities of interstate commerce, of the mails, or of the facilities of a national
28

securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district. Moreover, each of the Defendants resides in this district.

## SUMMARY

4.     This matter concerns multiple fraudulent and unregistered securities offerings conducted by Las Vegas-based hard money lender CapSource, Inc. ("CapSource") and its principals, Stephen J. Byrne and Gregory P. Herlean (collectively, "Defendants").

5.     From approximately January 2015 through May 2019 (the "Relevant Period"), CapSource offered and sold over $151 million of securities through unregistered offerings to finance projects of various real estate developers.

6.     As part of these offerings, Defendants helped raise over $28 million for CapSource's largest client, an Arizona-based real estate developer ("Individual 1"), and certain entities related to his drug rehabilitation business ("Company A").

7.     By approximately May 2017, Company A had experienced significant financial difficulties and cost overruns at its primary treatment facility that depleted most of its cash reserves.

8.     To keep Company A's primary treatment facility afloat, the Defendants knew, or were reckless in not knowing, that Individual 1 was diverting millions of dollars of proceeds raised through CapSource for various other projects managed by Individual 1 (some wholly unrelated to Company A), and, contrary to the representations made to the investors in those projects, used them to cover expenses associated with Company A's primary treatment facility.

9.     The Defendants furthered their fraud by assisting Individual 1 in raising

2

millions of dollars in subsequent offerings in an attempt to shore up Company A's finances and replace the shortfalls other projects incurred due to the previous diversion of investor funds.  In raising these additional funds, Defendants and Individual 1 failed to disclose their intended use of the new offering proceeds to partially repay, and thereby conceal, the improper diversion of funds that had occurred.

10.     Currently, investors in the securities offered through CapSource are owed approximately $47 million of their principal, of which approximately $18 million relates to the offerings associated with Company A.

11.     As a result of the conduct described herein, Defendants violated and, unless restrained and enjoined, will continue to violate Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

12.     The SEC seeks permanent injunctions against each of the Defendants, enjoining each of them from future violations of the securities laws mentioned herein, disgorgement of all their ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties against each of the Defendants under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and such other relief that the Court may deem appropriate.

## DEFENDANTS

13.     **CapSource, Inc.** is a Nevada corporation with its principal place of business in Las Vegas, Nevada.  During the Relevant Period, CapSource was in the business of facilitating real estate-related lending transactions, primarily through the offer and sale of debt securities issued by other borrowing entities.  Neither CapSource nor the securities at issue have ever been registered with the SEC in any

capacity.

14.     **Stephen J. Byrne**, age 63, is a resident of Las Vegas, Nevada.  Byrne is president, founder, and 40% owner of CapSource.  During the Relevant Period, Byrne's principal role at CapSource was to identify and vet potential projects for CapSource to fund through the offer and sale of securities to investors and to perform work-outs of non-performing transactions.  Byrne has never held a securities license or been registered with the SEC in any capacity.

15.     **Gregory P. Herlean**, age 42, is a resident of Henderson, Nevada. Herlean is an executive team member and 30% owner of CapSource.  Herlean's principal role at CapSource during the Relevant Period was to find and solicit investors to acquire the securities offered through CapSource and to supervise CapSource's sales staff in that regard.  Herlean has never held a securities license or been registered with the SEC in any capacity.

## FACTS

**I.     Background on CapSource's Business**

### A.     CapSource's Historical Note Offerings

16.     CapSource is a hard money lender whose primary business has been locating investors to pool their funds and collectively invest in real estate-related projects.  CapSource accomplished this by offering and selling interests in promissory notes issued by other entities and secured by real estate to hundreds of investors nationwide.

17.     Each investor in a note funded through CapSource received a fractional share of the note proportionate to his or her investment and was, in turn, granted a secured interest in the underlying real estate in the project equal to his or her fractional interest in the note.

18.     Typically, the notes were secured by a senior position in the collateral, but, on occasion, CapSource offered interests in notes secured via subordinated positions that paid higher yields.

19.    CapSource generally paid annual interest rates to investors ranging between six and ten percent, but which could occasionally reach as high as 11 or 12 percent.

20.    CapSource marketed the note interests as "trust deeds," but also repeatedly referred to them on its website as "investments" and its customers as "investors."

21.    CapSource also marketed the note interests on its website as "passive" investments.

**B.    CapSource's Role in Assessing the Projects to Be Financed Through the Note Offerings**

22.    The borrowing entities that used CapSource to assist with funding their projects are located throughout the United States and historically have been associated with real estate developers.

23.    CapSource (specifically Byrne), not the note investors, selected and conducted due diligence relating to the projects and assessed the creditworthiness of potential borrowers.

24.    CapSource drafted a written summary for each project (the "Loan Summary") bearing CapSource's name and signed by the borrower, which described: the terms of the note, including the interest rate and maturity date; the project, including how the note proceeds were to be used; the collateral, including its estimated value relative to the note's principal amount; and some background on the borrower.

25.    At the end of the Loan Summary, the principal of the borrowing entity provided a signed certification as to the accuracy of the statements in the Loan Summary and as to his or her creditworthiness.

### C.   CapSource's Role in Locating and Soliciting Investors for the Note Offerings

26.    CapSource identified prospective new investors through seminars or speaking engagements conducted by Herlean and through leads provided by a network of external finders, who used radio and print advertising, and blast emails, among other marketing tactics.

27.    Once CapSource identified potential investors, it entered their contact information into a database that formed a call list for CapSource's internal sales staff. CapSource's sales staff would call leads and pitch the projects to be financed, which included sending a copy of the respective offering materials (e.g., Loan Summary) approved by Byrne and Herlean.

28.    Upon closing, CapSource typically received a percentage-based fee (often in the range of five to six percent), which it frequently used to pay commissions to external finders and account executives who located or solicited the investors.

## II.   Background on CapSource's Dealings with Individual 1 and Company A

### A.   Company A's Initial Funding Using CapSource

29.    Starting around early 2017, CapSource began assisting Individual 1 with financing his drug rehabilitation business, Company A.

30.    CapSource helped raise $13 million for Company A by offering and selling interests in a note issued by a subsidiary of Company A to approximately 165 investors in multiple states (the "1st Deed Note").

31.    Company A used the proceeds from the 1st Deed Note offering to, among other things, acquire and renovate a 207-bed drug rehabilitation facility in Tucson, Arizona (the "Tucson Facility") and to create reserve accounts to cover its operating costs during the start-up phase.

**B.      Byrne and Herlean Knew, or Were Reckless in Not Knowing, that Individual 1 Diverted Millions of Dollars to Cover Company A's Losses from Unrelated Projects Funded Through CapSource**

32.     By approximately May 2017, Company A's Tucson Facility experienced financial difficulties and cost overruns that depleted its construction and interest reserves.

33.     In order to continue operating the Tucson Facility, including to make payroll and interest payments to the 1st Deed Note investors, Individual 1 improperly used, with Byrne's knowledge, investor funds raised by CapSource to fund other projects for Individual 1.

34.     Byrne knew, or was reckless in not knowing, that Individual 1's use of funds to cover operating expenses associated with Company A's Tucson Facility was inconsistent with the Loan Summaries for those other projects.

35.     For example, on October 19, 2017, Individual 1 sent Byrne and Herlean a schedule showing the cumulative improper transfers from other projects to fund Company A's Tucson Facility exceeded $4.3 million.

36.     By November 2017, the improper transfers grew to over $4.7 million. Byrne and Herlean knew, or were reckless in not knowing, about these transfers.

37.     Moreover, by the end of 2017, Company A had incurred nearly $6 million in operating losses.  Byrne and Herlean knew, or were reckless in not knowing, about these operating losses.

**III.    The Fraudulent 2nd Deed Note Offering**

38.     In an attempt to reverse the improper transfers, Byrne, Herlean, and Individual 1 agreed that CapSource would assist Company A with a new note offering to raise enough funds to repay the other projects.  Accordingly, starting around January 2018 and continuing through August 2018, CapSource, on behalf of Individual 1 and a subsidiary of Company A, offered and sold approximately $5.7 million of interests in a note issued by the Company A subsidiary and secured by a

subordinate position in the Tucson Facility's real estate (the "2nd Deed Note") to 123 investors in multiple states.

### A.   False Statement Regarding the Use of Proceeds

39.   To solicit investors for the 2nd Deed Note offering, Byrne and Herlean authorized CapSource's sales staff to distribute a Loan Summary (prepared by Byrne and signed and certified as true by Individual 1) that deceived potential investors about the true purpose of the offering; in essence, to cover-up the misuse of proceeds from previous offerings.

40.   The 2nd Deed Note Loan Summary stated: "The subject loan is for continued renovation of the property [the Tucson Facility]."

41.   At the time the Loan Summary was distributed to investors, Byrne and Herlean (and thus CapSource) knew, or were reckless in not knowing, that the use of proceeds language in the Loan Summary was false.

42.   For example, on January 19, 2018, Byrne, Herlean, and Individual 1 met and developed a budget showing that proceeds from the 2nd Deed Note offering would be used to repay improper transfers from other projects, as well as to make Company A's payroll and to establish interest reserves for not only Company A, but several other projects unrelated to Company A's business.  These uses of the proceeds, especially the payment of millions of existing liabilities (i.e., diverted funds from other projects) as opposed to having funds available of future renovation, were inconsistent with what was represented to investors in the 2nd Deed Note.

43.   The false statement about the use of proceeds was material as a reasonable investor would want to know about the improper diversion of funds.

### B.   False Statement Regarding the Value of the 2nd Deed Note Collateral

44.   The Loan Summary also provided a collateral value for the 2nd Deed Note of $91.5 million based on a purported third-party valuation of "the property securing this loan."

45.     At the time the Loan Summary was distributed to investors, Byrne and Herlean (and thus CapSource) knew, or were reckless in not knowing, that the collateral value in the Loan Summary was false insofar as it was not based on an appraisal of the real estate securing the loan (i.e., the Tucson Facility), but was instead based on an enterprise value of Company A's business as a going concern.

46.     Moreover, unlike the 1st Deed Note Loan Summary, the 2nd Deed Note Loan Summary did not disclose the acquisition cost of the collateral (~$8.2 million), which was substantially less than the $91.5 million collateral value provided.

47.     The false statement about the collateral value was material as a reasonable investor would have wanted to know that the third party appraisal was, in fact, not valuing the property securing the loan, but was instead estimating Company A's going concern value.

### C.     False Statement Regarding Individual 1's Creditworthiness

48.     Individual 1, in addition to being chief executive officer and sole manager of Company A, was the guarantor of the note interests CapSource offered and sold for Company A's subsidiaries.

49.     As such, Individual 1 signed a certification in the 2nd Deed Note Loan Summary that stated: "I certify that all of the above information contained in the above Loan Summary is true and correct and that I have sufficient income, liquidity and cash flow to make the proposed payments as well as all my other obligations."

50.     At the time the Loan Summary was distributed to investors, Byrne and Herlean (and thus CapSource) knew, or were reckless in not knowing, that Individual 1's certification was false.

51.     Prior to the 2nd Deed Note offering, Individual 1 defaulted on an approximately $7 million bank loan secured by his 19,475 square foot residence due to Individual 1's inability to pay.  Following the 2nd Deed Note offering, Individual 1 assigned ownership of the home to his bank to avoid foreclosure, leaving the bank to sell the property for significantly less than the amount Individual 1 owed.

52.     Individual 1 informed Byrne of his home loan default in June 2016. Individual 1 subsequently informed Herlean of the default no later than April 2017.

53.     Defendants did not disclose that Individual 1 was, at the time of 2nd Deed Note offering, in default of his approximately $7 million dollar home loan due to his inability to pay.

54.     The false statement about Individual 1's creditworthiness was material as a reasonable investor would have wanted to know of Individual 1's multi-million dollar home loan default, which reflects an inability to satisfy his personal guaranties on the millions of dollars of note interests CapSource offered and sold to investors for projects managed by Individual 1.  Indeed, on its website, CapSource described such personal guaranties as being "essential" to "every" note interest offering.

**D.     False Statements Regarding Individual 1's Delinquent Interest Payments for April 2018**

55.     Given the large amount of funds that Company A was seeking to raise from investors in the 2nd Deed Note offering, CapSource was unable to fund the offering fast enough to allow Individual 1's entities, including some associated with Company A, to make all of their April 2018 interest payments when due.

56.     Herlean instructed CapSource's staff to send an email (that was sent on May 3, 2018) to all of the investors in the Company A-related notes.  That email blamed CapSource's third-party loan service provider ("Company B") for late interest payments (instead of Individual 1) and stated that Individual 1 had made the April interest payments to Company B when, in fact, such payments were not made.

57.     At the time Herlean approved sending the email to investors he (as well as Byrne) knew, or was reckless in not knowing, that the email was false and that Individual 1's entities were still approximately $200,000 delinquent on the April interest payments for ten notes, one of which was associated with Company A.

58.     Despite Herlean's effort to prevent investors from verifying the accuracy of the CapSource communication by obscuring Company B's name, an investor

contacted Company B to inquire about the supposed accounting error referenced in the May 3 email.

59.     When CapSource's operations staff informed Herlean of the investor's inquiry to Company B, he responded: "Well we have to deal with this and be vague as long as it takes to catch up [Individual 1's interest] payments or else all funding for [Individual 1] loans will stop."

60.     By mid-2018, CapSource was able to close additional funding for the 2nd Deed Note offering.  With Byrne's and Herlean's knowledge and approval, Individual 1 used some of these funds to make interest payments to existing investors in order to temporarily bring his entities' notes current.

61.     The false statements made in the May 3 email Herlean composed were material as a reasonable investor would have wanted to know 1) that Individual 1's entities had not made their interest payments to Company B, and 2) that CapSource was concealing the defaults.

**IV.     The Fraudulent $4 Million Regulation D Offering**

62.     Individual 1's practice of diverting and commingling funds from other CapSource-funded projects to keep Company A afloat continued into mid-2018, when he improperly transferred at least another approximately $1.3 million from other projects to fund Company A's Tucson Facility.  On July 26, 2018, Individual 1 circulated an updated schedule to Byrne and Herlean showing that Company A's Tucson Facility still owed millions to various other Individual 1-related projects due to the improper transfers.

63.     Meanwhile, by July 2018, Company A had incurred additional losses and had negative equity (accumulated losses) in excess of $7.3 million on a cash basis.  Byrne and Herlean knew, or were reckless in not knowing, about these losses.

64.     Knowing of Company A's losses, Byrne and Herlean agreed to assist Individual 1 with raising funds through an offering of equity securities that, as Byrne wrote in an August 16, 2018 email, "will allow us to replenish the money borrowed

by [Company A] from various other deals to fund [Company A's] shortfalls."

65.    From mid-August to late September 2018, CapSource, on behalf of Individual 1 and two subsidiaries of Company A, offered and sold $4 million of equity to 19 investors (the "$4M Reg. D" offering) in multiple states, representing an aggregate three percent ownership stake in the two Company A subsidiaries.

### A.    False Statement Regarding the Use of Proceeds

66.    To solicit investors for the $4M Reg. D offering, Byrne and Herlean authorized CapSource's sales staff to share with potential investors an offering memorandum ("Offering Memo") (prepared by Byrne, Herlean, and Individual 1) that contained several material misstatements and omissions.

67.    The Offering Memo described the securities offered and stated that the proceeds of the offering were to be used "for continued renovation of the property [the Tucson Facility] as well as the available credit lines which will cover the lapse in timing delays of payments from insurance companies."

68.    At the time the Offering Memo was distributed to investors, Byrne and Herlean (and thus CapSource) knew, or were reckless in not knowing, that the use of proceeds language in the Offering Memo was false.

69.    Contrary to the use of proceeds disclosure in the Offering Memo, approximately half of the $4M Reg. D offering proceeds were used to pay down ***existing*** liabilities, including some of the improperly diverted funds from other projects, as well as to pay an undisclosed six percent commission, approximately $240,000, to CapSource.

70.    The false statement about the use of proceeds was material as a reasonable investor would want to know of the improper diversion of funds that had occurred and its magnitude, and that CapSource was being paid to sell the offering (and the amount of its compensation).

**B.    Misleading Statement Regarding Potential Profits**

71.    As authorized by Byrne and Herlean, CapSource's sales staff sent excerpts from the Offering Memo, including a chart stating that investors could expect an average annual rate of return of 17.95%, via blast email to over 350 potential investors without regard to their accreditation or sophistication.

72.    At the time the Offering Memo excerpts were distributed to investors, Byrne and Herlean (and thus CapSource) knew, or were reckless in not knowing, that the aggressive profit projections provided to investors were misleading as they were not in line with Company A's history of multi-million dollar operating losses.

73.    Although Company A's financials were known to or would have been available to the Defendants, neither Byrne, Herlean, nor anyone else at CapSource disclosed any information to investors concerning Company A's historical operating losses and negative equity.

74.    The misleading statement about potential profits was material as a reasonable investor would have wanted to know that those projections deviated substantially from Company A's historical losses.

**V.    The Fraudulent Debt Conversion Offering**

75.    By January 2019, Company A was still unable to generate and collect sufficient revenues to meet its debt obligations, and its subsidiaries defaulted on their notes, including the 1st Deed Note and 2nd Deed Note.

76.    In response, Byrne and Herlean formulated a restructuring plan with Individual 1 to help Company A reduce its debt burden, which, at this point, required interest payments to investors on around $24 million in notes.  The plan involved a debt-for-equity offering (the "Debt Conversion" offering) where investors could convert their defaulted note interests into equity in a newly-created entity managed by Byrne ("Company C").  In return for the debt relief for Company A, Individual 1 transferred his ownership interest in the Company A subsidiary that owned the Tucson Facility's real estate to Company C.

77.    CapSource's sales staff aggressively pitched the Debt Conversion offering to the Company A-related note investors.

78.    Approximately 247 investors in multiple states agreed to convert to Company C equity, reducing Company A's debt burden by approximately $13.9 million.

79.    To solicit investors for the Debt Conversion offering, Byrne and Herlean authorized CapSource's sales staff to share a brochure for Company A (the "Marketing Deck") (prepared by Individual 1) with over 300 investors in the Company A-related notes.

80.    Among other things, the Marketing Deck included a valuation that assigned a going-concern value to Company A of between $55.8 and $65.8 million based on multi-million dollar profit projections (which were also shared with the investors).  Byrne and Herlean also both touted an approximately $50 million valuation of Company A during an interstate conference call with Individual 1 and over 100 of the Company A-related note investors on January 31, 2019.

81.    At the time CapSource distributed the Marketing Deck to investors and at the time of the January 31st investor call, Byrne and Herlean (and thus CapSource) knew, or were reckless in not knowing, that the valuations and profit projections for Company A provided to investors were misleading as they were not in line with Company A's history of multi-million dollar operating losses.

82.    Although Company A's financials were known to or would have been available to the Defendants, they failed to disclose to investors Company A's historical operating losses.

83.    The misleading statements about the value of Company A were material as a reasonable investor would want to know that the valuations were based on profit projections that deviated substantially from Company A's historical losses.

## VI.    The Defendants Offered and Sold Securities

84.    CapSource offered and sold investments that are "securities" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

85.    Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, any "note" or "investment contract."

86.    The securities offered and sold through CapSource included the following:

a.    For the 2nd Deed Note offering, CapSource offered and sold note interests to approximately 123 investors.  These note interests are securities in the form of "notes" and "investment contracts" as they involved a pooled investment of money intended to generate passive profits for the investors.

b.    For the $4M Reg. D offering, CapSource offered and sold equity interests in two subsidiaries of Company A to approximately 19 investors.  These equity interests are "investment contracts" as they involved a pooled investment of money intended to generate passive profits for the investors.

c.    For the Debt Conversion offering, CapSource offered and sold equity interests in Company C to approximately 247 investors.  These equity interests are "investment contracts" as they involved a pooled investment of assets (namely, converted note interests) intended to generate passive profits for the investors.

87.    Byrne and Herlean were each indirect sellers, or in the alternative, necessary and substantial participants in the securities offerings identified above involving CapSource.

88.     Byrne and Herlean, as the principals of CapSource, helped arrange the offerings and prepared or approved the offering materials (including the 2nd Deed Note Loan Summary, $4M Reg. D Offering Memo, and Debt Conversion Marketing Deck) that were distributed to investors by CapSource's sales staff (which Herlean supervised).  As such, their actions were integral to the success of the offerings.

89.     No registration statement was filed or in effect with the SEC pursuant to the Securities Act with respect to the securities offered and sold by the Defendants as described herein, and no exemption from registration existed with respect to those securities.

## VII.   Each of the Defendants Knowingly or Recklessly Made and Disseminated Material Misrepresentations

90.     As set forth above, each of the Defendants knowing or recklessly made or distributed false or misleading statements to investors when soliciting them for the 2nd Deed Note, $4M Reg. D, and Debt Conversion offerings.

91.     Byrne and Herlean, as executives and substantial owners of CapSource, had the power to act and did act on behalf of CapSource and, thus, their actions alleged herein, as well as their state of mind, is imputed to CapSource.

92.     As set forth above, each of the false and misleading statements referenced herein with respect to the 2nd Deed Note, $4M Reg. D, and Debt Conversion offerings were material at the time they were made and distributed. Those statements address fundamental aspects of the investments, including: 1) the intended use of the proceeds; 2) the integrity of Company A's management (e.g., improper commingling/misuse of funds); 3) the historical profitability of Company A; 4) the creditworthiness of Individual 1 (e.g., prior defaults); 5) the value of the collateral/assets to be acquired; or 6) whether persons selling the securities (e.g., CapSource) had an undisclosed conflict of interest (e.g., undisclosed commissions).

**VIII.** **The Defendants Misrepresentations Were Made and Disseminated "In the Offer or Sale" and "In Connection with the Purchase or Sale" of Securities**

93.     The misstatements and omissions alleged herein were made and disseminated by the Defendants to induce investors to acquire the securities offered through the 2nd Deed Note, $4M Reg. D, and Debt Conversion offerings.

94.     For example, a number of the misstatements and omissions alleged herein were made in the written offering materials disseminated to investors by CapSource, such as the 2nd Deed Loan Summary, the $4M Reg. D Offering Memo, and the Debt Conversion Marketing Deck.

95.     As such, the Defendants made and disseminated material misstatements and omissions in the offer or sale of securities as defined in Section 2(a)(1) of the Securities Act and in connection with the purchase or sale of securities as defined in Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

**IX.** **The Defendants Acted as Unregistered Brokers**

96.     Each of the Defendants acted as a "broker" as defined in Section 3(a)(4)(A) of the Exchange Act [15 U.S.C. 78c(a)(4)(A)].

97.     CapSource offered and sold over $151 million in securities of approximately 60 issuers, in the form of note and equity interests, to hundreds of unrelated investors nationwide.

98.     CapSource, through the actions of its employees (including Byrne and Herlean), prepared and/or distributed all of the written materials to investors in connection with those offerings.

99.     CapSource, through its internal sales force and external finders (overseen by Herlean), determined which investors to solicit and actively and aggressively sought out these investors through calls, blast-emails, advertising, and seminar presentations conducted by Herlean.

100.   CapSource, through Byrne, also located the borrowers and performed due diligence on the projects funded via CapSource and presented its assessments to investors (e.g., the Loan Summaries), describing the securities and the purported return/value associated with them.

101.   Neither Byrne nor Herlean were ever employees of any Company A-related issuers (or many other issuers), for whom they participated in securities offerings.

102.   CapSource received transaction-based compensation for each note interest offering in the form of percentage-based fees and, in the case of the $4M Reg. D offering, a six percent commission.

103.   Byrne and Herlean, as owners of CapSource, received a share of these transaction-based profits.

104.   In addition, Herlean had an ownership stake in some of CapSource's external finders, thereby permitting him to share in the commissions CapSource paid to those entities for referring investors who acquired securities in the offerings.

105.   Neither CapSource, Byrne, nor Herlean have never been registered with SEC as a broker or associated with a broker-dealer registered with the SEC.

## FIRST CLAIM FOR RELIEF

### (All Defendants)

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

106.   The SEC realleges and incorporates by reference above paragraphs 1 through 105.

107.   During the Relevant Period, each of the Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or

omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

108.   By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### (All Defendants)

### Violations of Sections 17(a) of the Securities Act

### [15 U.S.C. § 77q(a)]

109.   The SEC realleges and incorporates by reference above paragraphs 1 through 105.

110.    During the Relevant Period, each of the Defendants, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly, recklessly, and negligently: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

111.   By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**(All Defendants)**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**[15 U.S.C. §§ 77e(a) and 77e(c)]**

112.    The SEC realleges and incorporates by reference above paragraphs 1 through 105.

113.    During the Relevant Period, each of the Defendants, directly or indirectly: (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, those identified in Paragraph 106, as to which no registration statement has been in effect and for which no exemption from registration has been available; (b) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities, including, but not limited to, those identified in Paragraph 106, as to which no registration statement has been in effect and for which no exemption from registration has been available; and (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use of medium of any prospectus or otherwise, securities, including, but not limited to, those identified in Paragraph 106, as to which no registration statement has been in effect and for which no exemption from registration has been available.

114.    By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## FOURTH CLAIM FOR RELIEF

### (All Defendants)

### Violations of Section 15(a) of the Exchange Act

### [15 U.S.C. § 78o(a)]

115.   The SEC realleges and incorporates by reference above paragraphs 1 through 105.

116.   During the Relevant Period, each of the Defendants, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as broker-dealers, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the SEC as brokers or dealers or when they were not associated with an entity registered with the SEC as a broker-dealer.

117.   By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that each of the Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining each of the Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Order each of the Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains.

### IV.

Order each of the Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

A jury trial on all issues triable to the jury.

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  December 21, 2020

> /s/ Terry R. Miller
> Terry R. Miller (*pro hac vice*)
> Attorney for Plaintiff
> Securities and Exchange Commission